IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FILED

JUN 2 6 2012

CLERK, U.S. DISTRICT COURT
By_____
Deputy

PHRORY MORAN GAMBLE, §
§
Petitioner, §
§
v. § No. 4:12-CV-057-A
§
RICK THALER, Director, §
Texas Department of Criminal §
Justice, Correctional §
Institutions Division, §
§
Respondent. §

MEMORANDUM OPINION
and
ORDER

This is a petition for writ of habeas corpus pursuant to 28

U.S.C. § 2254 filed by petitioner, Phrory Moran Gamble, a state

prisoner currently incarcerated in the Texas Department of

Criminal Justice, Correctional Institutions Division, in

Lovelady, Texas, against Rick Thaler, Director of the Texas

Department of Criminal Justice, Correctional Institutions

Division, respondent. After having considered the pleadings,

state court records, and relief sought by petitioner, the court

has concluded that the petition should be denied.

I. Factual and Procedural History

In affirming the trial court's judgment, the Second Court of

Appeals of Texas set out the factual and procedural background of

the case as follows:

A grand jury indicted Appellant for aggravated sexual assault of a minor.  Appellant pleaded "not guilty," and the case was tried to a jury.

M.L. was born in 1995, and he was eleven years old at the time of trial.  His mother, Christine, testified that she met Appellant at work in 1998 and that they developed a romantic relationship while living together as roommates.  Christine and Appellant had two children together, Z.H. in 1999 and K.H. in 2002.  Christine testified that her relationship with Appellant was imperfect and that he eventually became physically abusive.

Christine testified that she moved to Boston with the children to get away from Appellant, but Appellant followed them to Boston two months later.  She said that while they were living in Boston, M.L.'s teacher made a physical-abuse referral to Child Protective Services ("CPS").  Christine testified that CPS investigated and concluded that Appellant had physically abused M.L.  Christine said that after living in Boston for about a year, she, Appellant, and the children moved to Arkansas, where Appellant's family lived.  She later left Appellant and returned to Texas with the children.

Christine testified that when M.L. was almost ten, she and M.L. were watching a television news program about a man who said he had been molested.  She said that M.L. then told her that Appellant had blindfolded him, taken him to the bathroom, told him he was going to give him some candy, instructed him to open his mouth, and put Appellant's penis into M.L.'s mouth.  She testified that M.L. said that he did not tell her sooner because he was scared Appellant would kill him if he told anyone.  Christine reported M.L.'s outcry to Irving police, whose investigation ultimately led to this case.

M.L. testified that when he was three years old

2

and lived in Texas (he could not remember what city) with Christine and Appellant, Appellant would sometimes watch him when Christine was at work.  He testified that Appellant would play "the ninja game," in which Appellant would put a plastic grocery bag over M.L.'s head and prevent M.L. from breathing.  He said that if he got dizzy and fell down, Appellant would tie the bag shut at M.L.'s neck.  M.L. said they played the ninja game "a lot."

M.L. also testified that Appellant would sometimes choke him with one or both hands.  He testified that Appellant told M.L. he would kill him if he told Christine about the ninja game.  M.L. recounted the following incident, which he said happened in Boston around the time his teacher called CPS:

> He had put the plastic bag over my head, but this time for some reason he left a hole in there so I could breathe.  And then I took advantage and opened it.  And then he put another one over my head and this time I bit through it and then opened it.  And then he put another one over my head and I bit through that one and opened it.  And then he took all of them and shoved them in my mouth and took me in the kitchen and had me on the counter and screamed I was-he was going to kill me.

He said that on another occasion, Appellant pushed his head down onto a coffee table, leaving a permanent scar; the State, without objection, exhibited the scar to the jury.

M.L. said that on yet another occasion, Appellant became angry when M.L. would not eat a peanut butter sandwich.  He testified that Appellant tied a belt around M.L.'s throat, hung him in a closet by the belt, and knocked on the door while "scream[ing] the scary movie guy's name."[FN2]

FN2.  Other testimony indicated that M.L.

meant the names of various horror-movie
villains.

Finally, M.L. testified about the alleged sexual
assault.  He said that Appellant told M.L. that
Appellant had some candy in the bathroom, took him into
the bathroom, told him to close his eyes, and put his
"private" into M.L.'s mouth.  He said there was candy
on Appellant's private.  M.L. testified that he knew it
was Appellant's private because he heard him "zipping .
. . back up."  He said he did not remember having
previously said that Appellant had blindfolded him.  He
said he told Christine about this incident when he was
nine and that he did not tell her sooner because he was
afraid Appellant would kill him.

Dr. Jayme Coffman, medical director of a CARE team
at Cook Children's Medical Center, testified that she
had examined M.L.'s medical records, and she read to
the jury notes from an interview M.L. gave to members
of another CARE team.  According to the notes, M.L.
told the interviewer that Appellant had hung M.L. by
his neck in a closet, tied plastic bags over M.L.'s
head, and put his private in M.L.'s mouth.  Dr. Coffman
characterized the physical abuse described by M.L. as
"serious and sadistic."  She testified that abuse can
be a form of control over children, and when asked
whether physical dominance and sexual abuse "kind of go
together," she answered,

> [A]ny time you have domestic violence, you're
> more likely to see physical abuse and/or
> sexual abuse.  Any time you see physical
> abuse, you're more likely to see-I mean see
> domestic violence and/or sexual abuse.  All
> three things are more common when you see any
> one.

Carolyn Kincaid, a Dallas CPS investigator,
testified that she interviewed M.L. in June 2005.
Kincaid said that M.L. told her that when he was about
three, Appellant would choke him with his hands, tie
grocery bags over his head, hang him by a belt in the

closet, and, on one occasion, put his penis in M.L.'s
mouth after telling M.L. that he was going to give him
a piece of candy.

The jury convicted Appellant of aggravated sexual
assault, and the trial court sentenced him to life in
prison.

*Gamble v. State*, No. 2-07-174-CR, slip op., 2009 WL 806879, at

*1-2 (Tex. App.-Fort Worth Mar. 27, 2009).  The Texas Court of

Criminal Appeals refused petitioner's petition for discretionary

review and denied his state habeas application without written

order.  (State Habeas R. at cover[1])  *Gamble v. State*, PDR No.

063-09.  This federal petition for habeas relief followed.

## II.  Issues

Petitioner claims (1) he was denied due process of law

during the state direct appeal because, although finding evidence

of petitioner's physical abuse of M.L. was "probably unfairly

prejudicial," the appellate court did not conduct a harm analysis

(ground one), and (2) he was denied effective assistance of trial

counsel (grounds two through ten).  (Pet. at 6-7b)

## III.  Rule 5 Statement

Respondent does not believe that the petition is barred by

the statute of limitations, that the petition is successive, or

---

[1]"State Habeas R." refers to the state court record in
petitioner's state habeas Application No. WR-76,848-01.

that petitioner's claims are unexhausted.   (Resp't Answer at 6)

## IV.  Discussion

### A.  *Legal Standard for Granting Habeas Corpus Relief*

Under 28 U.S.C. § 2254(d), a writ of habeas corpus on behalf

of a person in custody pursuant to the judgment of a state court

shall not be granted with respect to any claim that was

adjudicated on the merits in state court proceedings unless he

shows that the prior adjudication:  (1) resulted in a decision

that was contrary to, or involved an unreasonable application of,

clearly established federal law, or (2) resulted in a decision

that was based on an unreasonable determination of the facts in

light of the evidence presented in the state court.  28 U.S.C. §

2254(d).  A decision is contrary to clearly established federal

law if the state court arrives at a conclusion opposite to that

reached by the Supreme Court of the United States on a question

of law or if the state court decides a case differently than the

Supreme Court has on a set of materially indistinguishable facts.

*Williams v. Taylor*, 529 U.S. 362, 405-06 (2000); *see also Hill v.*

*Johnson*, 210 F.3d 481, 485 (5th Cir. 2000), *cert. denied*, 532

U.S. 1039 (2001).  A state court decision will be an unreasonable

application of clearly established federal law if it correctly

identifies the applicable rule but applies it unreasonably to the

facts of the case. *Williams*, 529 U.S. at 407-08.

Further, federal courts give great deference to a state court's factual findings. *Hill*, 210 F.3d at 485. Section 2254(e)(1) provides that a determination of a factual issue made by a state court shall be presumed to be correct. This presumption of correctness applies to explicit and implicit findings of fact which are necessary to the state court's conclusions of mixed law and fact and to the state court's credibility determinations. *Valdez v. Cockrell*, 274 F.3d 941, 948 n.11 (5th Cir. 2001); *Galvan v. Cockrell*, 293 F.3d 760, 764 (5th Cir. 2002). The petitioner has the burden of rebutting the presumption of correctness by clear and convincing evidence. 28 U.S.C. § 2254(e)(1). When the Texas Court of Criminal Appeals denies relief in a state habeas corpus application without written order, it is an adjudication on the merits, which is entitled to this presumption. *Ex parte Torres*, 943 S.W.2d 469, 472 (Tex. Crim. App. 1997). Under these circumstances, a federal court may assume the state court applied correct standards of federal law to the facts, unless there is evidence that an incorrect standard was applied, and imply fact findings consistent with the state court's disposition. *Townsend v. Sain*,

372 U.S. 293, 314 (1963)[2]; *Catalan v. Cockrell*, 315 F.3d 491, 493

n.3 (5th Cir. 2002); *Valdez*, 274 F.3d at 948 n.11; *Goodwin v.*

*Johnson*, 132 F.3d 162, 183 (5th Cir. 1997).

### B.   *Extraneous Offense Evidence*

Petitioner claims he was denied due process of law under the

Fifth and Fourteenth Amendments to the United States Constitution

because the appellate court did not conduct a harm analysis after

determining the extraneous offense evidence regarding

petitioner's physical abuse of M.L. was "probably unfairly

prejudicial."[3]   (Pet. at 6; Pet'r Mem. at 3; Pet'r Traverse at 1-

3)   According to petitioner, the appellate court's decision was

an unreasonable application of the Supreme Court's decision in

*Old Chief v. United States*, 519 U.S. 172 (1997), wherein the

Court quotes then-Judge Breyer:   "Although . . . 'propensity

_____

[2]The standards of *Townsend v. Sain* have been incorporated
into 28 U.S.C. § 2254(d).  *Harris v. Oliver*, 645 F.2d 327, 330
n.2 (5th Cir. 1981).

[3]Petitioner did not raise his federal due process claim on
appeal or in his application for state habeas review.  Thus, the
claim is unexhausted.  28 U.S.C. § 2254(b) *Duncan v. Henry*, 513
U.S. 364, 366 (1995) (per curiam) ("If a habeas petitioner wishes
to claim that an evidentiary ruling at a state court trial denied
him the due process of law guaranteed by the Fourteenth
Amendment, he must say so, not only in the federal court, but in
the state court.").  Nevertheless, because respondent did not
raise the procedural bar, the court considers the claim.

8

evidence' is relevant, the risk that a jury will convict for crimes other than those charged-or that, uncertain of guilt, it will convict anyway because a bad person deserves punishment-creates a prejudicial effect that outweighs ordinary relevance." 519 U.S. at 181 (citing *United States v. Moccia*, 681 F.2d 61, 63 (C.A.1 1982)) (holding that where a prior conviction is an element of the crime charged, evidence of a defendant's prior conviction may not be admitted if the defendant is willing to concede to the fact of the conviction).

Based solely on state statute, state case law, and state evidentiary rules, the appellate court addressed the issue as follows:

> In his first point, Appellant argues that the trial court abused its discretion by admitting evidence concerning the extraneous offenses against M.L., specifically, the "ninja game," the choking and belt-hanging incidents, and the injury to M.L.'s head. At a pretrial hearing regarding the admissibility of that evidence, the trial court heard testimony from M.L. about the extraneous offenses.  Appellant objected to the extraneous offense evidence as irrelevant, unrelated to the charged sexual assault, and unfairly prejudicial.  The trial court ruled that it would admit the evidence under code of criminal procedure article 38.37, section 2.

> We review a trial court's evidentiary rulings for an abuse of discretion.  A trial court abuses its discretion only when the decision lies outside the zone of reasonable disagreement.  When determining whether a

9

trial court's evidentiary ruling was an abuse of
discretion, we review the ruling in light of the
evidence that was before the court at the time of its
ruling.

**a. Article 38.37**

<u>Code of criminal procedure article 38.37, section 2</u>
provides,

> Notwithstanding Rules 404 and 405, Texas
> Rules of Evidence, evidence of other crimes,
> wrongs, or acts committed by the defendant
> against the child who is the victim of the
> alleged [physical or sexual assault] shall be
> admitted for its bearing on relevant matters,
> including:
>
> (1) the state of mind of the defendant and
> the child; and
>
> (2) the previous and subsequent relationship
> between the defendant and the child.

Thus, article 38.37 is an exception to rule 404(b)'s
prohibition on the admission of character-conformity
extraneous offense evidence.  The State, as the
proponent of extraneous offense evidence, bears the
burden of showing admissibility of the evidence under
article 38.37.

Evidence of an extraneous offense is relevant to
explain why a victim of sexual assault did not make a
prompt outcry.  It is also relevant to show the reason
for a complainant's acquiescence to sexual assault and
a defendant's dominance over the complainant.

In this case, evidence of Appellant's physically
abusing M.L. was relevant to show the relationship
between Appellant and M.L. before and after the alleged
sexual assault under article 38.37.  Appellant's
threats to kill M.L. were admissible to explain why
M.L. waited six years before making his outcry to

Christine.  The physical abuse evidence also demonstrated Appellant's dominance over M.L.  We therefore hold that the trial court did not abuse its discretion by ruling that the extraneous offense evidence was relevant under article 38.37.

**b.  Rule 403 Balancing Test**

Evidence relevant under article 38.37 must nevertheless be excluded if the probative value of the evidence is substantially outweighed by the danger of unfair prejudice.  "[I]n prosecutions for sexual offenses against children, 'extraneous acts between the complainant and the defendant are usually more probative than prejudicial.'"  Rule 403 provides, "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or needless presentation of cumulative evidence."  "Probative value" refers to the inherent probative force of an item of evidence-that is, how strongly it serves to make more or less probable the existence of a fact of consequence to the litigation-coupled with the proponent's need for that item of evidence.  "Unfair prejudice" refers to a tendency to suggest a decision on an improper basis, commonly, though not necessarily, an emotional one.  Only "unfair" prejudice provides the basis for exclusion of relevant evidence.  "Confusion of the issues" refers to a tendency to confuse or distract the jury from the main issues in the case.  "Misleading the jury" refers to a tendency of an item of evidence to be given undue weight by the jury on other than emotional grounds.

When a defendant makes a rule 403 objection, the trial court has a nondiscretionary obligation to weigh the probative value of the evidence against the unfair prejudice of its admission.  By overruling such an objection, the trial court is assumed to have applied a rule 403 balancing test and determined the evidence was admissible.

The trial court has wide latitude to admit or exclude evidence of extraneous offenses. A reviewing court must therefore recognize that the trial court is in a superior position to gauge the impact of the relevant evidence and not reverse a trial court's ruling if it is within the "zone of reasonable disagreement." In balancing probative value and unfair prejudice under rule 403, an appellate court presumes that the probative value will outweigh any prejudicial effect. It is therefore the objecting party's burden to demonstrate that the probative value is substantially outweighed by the danger of unfair prejudice.

The relevant criteria in determining whether the prejudice of an extraneous offense clearly outweighs its probative value include (1) the inherent probative force of the proffered item of evidence along with (2) the proponent's need for that evidence against (3) any tendency of the evidence to suggest decision on an improper basis, (4) any tendency of the evidence to confuse or distract the jury from the main issues, (5) any tendency of the evidence to be given undue weight by a jury that has not been equipped to evaluate the probative force of the evidence, and (6) the likelihood that presentation of the evidence will consume an inordinate amount of time or merely repeat evidence already admitted. A trial court does not have to perform the balancing test on the record. "In reviewing the trial court's balancing test determination, a reviewing court is to reverse the trial court's judgment 'rarely and only after a clear abuse of discretion.'"

In this case, the first two balancing criteria weigh in favor of admitting the extraneous offense evidence. The evidence was probative of the relationship between Appellant and M.L. and the reason for M.L.'s delayed outcry. In light of Dr. Coffman's testimony that sexual abuse is more likely in a relationship where there is also physical abuse, the evidence that Appellant physically abused M.L. makes it more likely that he sexually abused M.L. Further,

12

Appellant's defense was that M.L. made up the sexual
abuse story; thus, the extraneous offense evidence was
relevant to M.L.'s credibility.   The State's need for
the physical abuse and death-threat evidence-in some
form, though not necessarily the detailed, graphic, and
repetitive testimony actually presented to the jury-was
substantial to explain M.L.'s delayed outcry.

    The next two factors weigh in favor of exclusion.
The detailed evidence of Appellant's physically abusing
M.L. had a definite tendency to suggest a decision on
an improper basis, that is, conviction for the physical
abuse instead of the charged sexual assault.   Likewise,
M.L.'s horrific testimony about the "ninja game" and
being hung by the neck with a belt had the tendency to
confuse or distract the jury from the main issue,
whether Appellant sexually assaulted M.L., and there
was a danger that the jury would give the physical
abuse testimony undue weight.

    The final factor-the likelihood that presentation
of the evidence will consume an inordinate amount of
time or merely repeat evidence already admitted-does
not clearly weigh in favor of admission or exclusion.
M.L.'s testimony about the physical abuse comprises
over seven pages of reporter's record, while his
testimony about the sexual assault comprises two pages.
Dr. Coffman's and Kincaid's testimony was similarly
skewed; for example, Dr. Coffman's testimony about
M.L.'s statement concerning the sexual assault
comprises four lines of the record, while her testimony
about the physical abuse comprises sixty-six lines.
But the question is whether the physical abuse
testimony consumed an inordinate amount of time.
Because the alleged physical abuse occurred repeatedly
over a long period of time while the sexual assault
occurred just once, describing the physical abuse
necessarily consumed more time than describing the
sexual assault.   Therefore, we cannot say that the
physical abuse testimony, as extensive as it is,
consumed an inordinate amount of time. On the other
hand, Dr. Coffman's and Kincaid's testimony largely
repeated what M.L. had already told the jury, and this

repetition weighs in favor of exclusion, though only of
Dr. Coffman's and Kincaid's testimony.  But we must
review the trial court's ruling in light of the
evidence that was before the court at the time of its
ruling, . . . and nothing in the record suggests that
the trial court should have known that the evidence of
physical abuse would consume as much time as it did or
be as repetitive as it was when the court overruled
Appellant's objections at the pretrial hearing.

        This is a close case.  The physical abuse evidence
was horrific.  It was undoubtedly prejudicial to
Appellant.  It was probably unfairly prejudicial.  But
it was probative, and the balancing test factors,
considered as a whole, do not clearly weigh in favor of
holding that the evidence's unfair prejudice
substantially outweighed its probative value.  Thus, we
cannot say that the trial court's overruling of
Appellant's rule 403 objection fell outside the zone of
reasonable disagreement, and we hold that the trial
court did not clearly abuse its discretion.  We
therefore overrule Appellant's first issue.[FN4]

        FN4.  Because we hold that the trial court
        did not clearly abuse its discretion, we need
        not conduct a harm analysis.  We note that
        much of the State's closing argument
        emphasized the physical abuse testimony and
        even encouraged the jury to convict Appellant
        "because [he is] the kind of person" who
        would "humiliate, . . . brutalize, and . . .
        terrorize a three-year-old little boy."
        Because the State's emphasis of
        erroneously-admitted evidence is a
        harm-analysis factor, . . . we will not set
        out or analyze the State's argument.

*Gamble*, 2009 WL 806879, at *3-6 (citations and footnote 3

omitted).

        A federal habeas court will disturb state court evidentiary

rulings on habeas review only if they render the trial fundamentally unfair. *Payne v. Tennessee*, 501 U.S. 808, 825 (1991); *Pemberton v. Collins,* 991 F.2d 1218, 1226 (5th Cir. 1993); *Scott v. Maggio,* 695 F.2d 916, 922 (5th Cir. 1983). Under Texas Code of Criminal Procedure article 38.37, § 2, evidence of extraneous evidence is more often admissible in cases involving sexual assaults of children, notwithstanding Texas's normal rules of evidence. *Kessler v. Dretke*, 137 Fed. Appx. 710, 2005 WL 1515483, at *1 (5th Cir. June 28, 2005), *cert. denied*, 546 U.S. 1105 (2006). The admission of such evidence does not violate due process if the state "makes a strong showing that the defendant committed the offense and if the extraneous offense is rationally connected with the offense charged." *Wood v. Quarterman*, 503 F.3d 408, 414 (5th Cir. 2007). The evidence of petitioner's physical abuse of M.L. was properly admitted because it bears a rational relationship to the charged offense. Moreover, there is no evidence that admission of the extraneous offense evidence rendered the entire trial fundamentally unfair or that but for the admission of the evidence the result of petitioner's trial would have been different. *Brecht v. Abrahamsom*, 507 U.S. 619, 637 (1993).

15

### C.   Ineffective Assistance of Counsel

Petitioner claims trial counsel was ineffective because counsel failed to object to the following closing argument by the state during the guilt/innocence phase of the trial:

> Ladies and gentlemen, Phrory Gamble is a brutal, violent man who terrorizes, humiliates, and tries to choke the very breath out of a child. . . .   You know that this is the life that M.L. had to live for six years.  And you know from listening to the evidence that this family ran away from him over and over and over again.
>
> . . .
>
> And Phrory Gamble decides that it's okay to humiliate, to brutalize, and to terrorize a three-year-old little boy, because that's the kind of person he is. . . .
>
> . . .
>
> This is about a man who continually terrorizes and abuses a family and you know, you know because you saw it on Christine's face when she had to come in here. . .
>
> She thought she was the only one. . . .   She is a battered woman.
>
> . . .
>
> And you know for sure that you can believe Michael about the other abuse because that's already been determined.  So why then after all that would he just up and make up this one more act so that one more time in M.L.'s life he had to come in here and see that man? The man who tried to choke the very breath out of his body over and over again.

(RR, vol. 6, at 4-10, 23)

Petitioner also claims counsel was ineffective by failing to obtain a ruling on his objections to the introduction of extraneous offense evidence regarding his alleged physical abuse of Christine and then failed to object contemporaneously to its introduction on the proper grounds; agreeing to allow the state to use Dr. Coffman as a "surrogate" witness, thus denying petitioner his right to confront the doctor who actually conducted the examination of the victim; failing to retain an expert witness in child psychology to rebut the state's expert witness testimony and support the defensive theory; failing to introduce exculpatory evidence that the 2000 Boston CPS investigation ended with a finding that allegations were unfounded because the complainant had made no outcry of sexual assault; introducing evidence of the Boston CPS investigation and eliciting the finding that allegations of physical abuse had been found as true in that investigation; refusing to introduce a police report to impeach Christine's testimony and show that she was a highly manipulative person who had attempted to manipulate police into killing petitioner by lying to them that petitioner had a gun during a domestic abuse investigation; and eliciting harmful testimony from Dr. Coffman that the complainant and his

17

mother were hiding in shelters due to their fear of petitioner and calling CPS investigator Carolyn Kincaid and opening the door for the state to bolster its case through cross-examination of Dr. Coffman and Carolyn Kincaid.  Finally, petitioner claims the cumulative effect of counsel's deficient performance denied him his right to a fair trial and effective assistance of counsel. (Pet. at 6-7(b); Pet'r Mem. at 4-22; Pet'r Traverse at 3-19)

A criminal defendant has a constitutional right to the effective assistance of counsel at trial.  U.S. CONST. amend. VI, XIV; *Strickland v. Washington*, 466 U.S. 668, 688 (1984).  To establish ineffective assistance of counsel a petitioner must show (1) that counsel's performance fell below an objective standard of reasonableness, and (2) that but for counsel's deficient performance the result of the proceeding would have been different.  *Strickland*, 466 U.S. at 688.  Both prongs of the *Strickland* test must be met to demonstrate ineffective assistance.  *Id.* at 687, 697.  In applying this standard, a court must indulge a strong presumption that counsel's conduct fell within the wide range of reasonable professional assistance or sound trial strategy.  *Id.* at 668, 688-89.  Judicial scrutiny of counsel's performance must be highly deferential and every effort must be made to eliminate the distorting effects of hindsight.

*Id.* at 689.

The state habeas judge, who also presided over petitioner's trial, conducted a hearing by affidavit, wherein trial counsel J. Rex Barnett and Douglas T. Emerson, both licensed to practice law since 1988, responded to petitioner's claims as follows:

. . .

(C) **Medical Records:** Applicant contends that it was error to allow Dr. Coffman to testify as to medical records relating to the alleged victim's sexual assault exam. Said exam did not contain any physical findings that would support sexual assault; as such there were no physical finding to contest. Dr. Coffman did read the notes regarding the diagnostic interview with the alleged victim; however these would have been admissible had the examining doctor testified. When Dr. Coffman was asked by the State about here [sic] opinions regarding the exam, the Applicant's attorney[]s objected. Overall, the undersigned attorney believed that there was no harm in allowing Dr. Coffman to read the testimony, and, actually preferred having a "cold" record testified to rather than having the actual examining doctor present to add his additional observations and opinions. The undersigned attorney believes that the second hand testimony of Dr. Coffman made less impact on the jury than the examining doctor's testimony would have.

(D) **Opening the door (Coffman):** While the undersigned attorney do[es] not believe that any door was opened by asking Dr. Coffman to read the final assessment, the contents of the report stated that a sexual assault may or may not have occurred, and that the physical findings could not definitely support a finding of sexual assault was an important point to present to the jury. The facts contained in the assessment that the Applicant objected to were entered into evidence by other witnesses, and interjected no

new harmful information before the jury.

(E) **Eliciting harmful testimony (Huffman):** The reasons for inquiring about the prior CPS investigation are fully set out in the hearing outside the jury set out in the record in Volume 5 of the State of Facts, pages 25-31. The undersigned attorney believes that the fact that a CPS investigation occurred subsequent to the date of the alleged assault, but prior to the alleged victim's outcry, which did not find any evidence of sexual abuse was an extremely important fact for the jury to be aware of.

(F) **Family History:** Applicant contends that the undersigned attorney opened the door on harmful testimony regarding the history of family violence. The undersigned believes that the record will show that the undersigned attorney was extremely cautious about opening the door to specific allegations of prior alleged domestic abuse, raising the issue in two hearings outside the presence of the jury (State of Facts Volume 5, pages 25-31 and 76-78). The undersigned attorney did feel it important to show the jury that the Applicant and the victim's mother had a stormy, on-and-off against relationship, but that the mother kept continuing a relationship with Applicant-the point being how said relationship effected her credibility-i.e. if the Applicant was so bad, why did you keep going back to him-and that she had a reason to lie about the abuse. It was also necessary to go into this to bring up the prior CPS investigation discussed above which did not find any evidence of sexual abuse, which was what the Applicant was charged with. The specific[] allegations of prior domestic abuse were not allowed into testimony.

(G) **Eliciting harmful testimony (Kincaid):** The undersigned attorney believed that it was extremely important to be able to present an alternate reason for why the victim's mother, Christine Huffman, would have for making the allegations of sexual abuse against the applicant. The undersigned attorney felt that the pattern shown in the relationship-the on-and-off nature

of the relationship, the mutual fights, the prior CPS investigations with NO finding sexual abuse, and NO allegations of sexual abuse UNTIL Ms. Huffman felt that there was a threat of the Applicant gaining custody of her son, the alleged victim-was an extremely important and essential part of the defense. The undersigned attorney felt that Ms. Huffman's statements to CPS investigator Kincaid about her fear that the Applicant was trying to take her son away from her[] were an extremely important part of the defense. The other objected to information elicited by the State's cross-examination had already been entered into evidence by other testimony, and the undersigned attorney felt that testimony of Kincaid regarding Huffman's statements outweighed the other already-in-evidence testimony of Kincaid.

(H)  **Failure to impeach:**  The Applicant contends that it was ineffective for the undersigned attorney to fail to impeach Christine Huffman's credibility by showing specific acts of dishonesty and/or erratic behavior in the past. However, in this case there was a tremendous amount of very bad history between the parties, including multiple acts of domestic violence alleged to have been committed by the Applicant, including physical abuse and destruction of property; also, the Applicant had a prior conviction for sexual assault in another state that the undersigned attorney felt was essential to keep out of evidence at the guilt/innocence portion of the trial. A reading of the record shows that throughout the trial the undersigned attorney was walking a tightrope between attempting to attack the evidence against the applicant and opening the door to a mountain of extraneous offenses.

[T]he evidence that Applicant wanted the undersigned attorney to attempt to impeach Ms. Huffman with was not directly relevant to the charged offense, and would, in the undersigned attorney's opinion, [p]ut the Applicant's character in issue also, which would have been even more prejudicial to the Applicant's case than what did wind up in evidence.

**(I)   Failure to hire child psychologist:**   The Applicant alleges that the undersigned attorney should have had the alleged victim examined by a child psychologist in order to support the theory of the case that the child was forced to make these allegations by the child's mother.   The undersigned attorney did not believe that such an examination was necessary in order to present the alternate theory of the facts, and, in fact, might be counter-productive had the examination shown t hat there was no coercion on the part of the mother.   The undersigned attorney also believed that even had the a child psychologist testified that there was a chance that has occurred, the State would have put up it's own expert to rebut theory, and it was likely that during the "battle of the experts" facts would have come into evidence that, as discussed above, the Applicant's attorney was very careful to keep out. The issue was placed before the jury and argued by the undersigned attorney at closing argument, which was what the undersigned attorney desired–another interpretation of the facts . . . .

**(J)   Failure to object during State's argument:** During the State's closing arguments, the defense objected three times.   The basis of the defense objections were to prosecutor's statements regarding evidence which the defense thought was not consistent with evidence presented at trial, and made a more negative picture of Applicant than supported by the evidence.   The defense did not object at some of the statements not involving mis-characterization of evidence, as:   (1) most of the objected to statements by the State were within the scope of legitimate argument; (2) the defense believed that frequent objections to the opposing counsel's argument that were likely to be overruled would weaken the impact of the objections the defense did make–i.e. misstatements of evidence that the defense felt needed to be pointed out by it's objections; and (3) would encourage the State to disrupt the defense's argument by frequent objections in response to unnecessary objections by the defense during the State's arguments.

(State Habeas R. at 118-28)

The state habeas court entered the following findings of fact consistent with counsel's affidavits:

18.  Dr. Jamie Coffman testified regarding M.L.'s sexual assault examination.

19.  The sexual assault examination did not result in any physical findings.

20.  Dr. Coffman did not conduct the sexual assault examination.

21.  Mr. Barnett and Mr. Emerson did not object to Dr. Coffman reading the examining physician's notes from the diagnostic interview because they believed that those notes were admissible.

22.  Mr. Barnett and Mr. Emerson did object to Dr. Coffman offering any opinions regarding the sexual assault examination.

23.  Mr. Barnett and Mr. Emerson concluded that having Dr. Coffman read a "cold record" was preferable to having the actual examining physician present this information along with additional opinions and observations.

24.  Mr. Barnett and Mr. Emerson concluded that Dr. Coffman's second-hand testimony would have less impact than testimony from the actual examining physician.

25.  Mr. Barnett and Mr. Emerson believed that the admission of evidence that the examination contained no physical findings was important to challenge whether a sexual assault actually occurred.

26.  Dr. Coffman's testimony presented no new harmful information because the facts contained in the

sexual examination assessment came in through
other witnesses.

27.   Mr. Barnett and Mr. Emerson did not open the door
to the admission of any new harmful information by
permitting Dr. Coffman to read the final
assessment.

28.   Mr. Barnett and Mr. Emerson acted reasonably
regarding Dr. Coffman's testimony.

29.   The applicant suffered no harm by the conduct of
Mr. Barnett and Mr. Emerson regarding Dr. Coffman.

30.   The trial court admitted into evidence the fact of
a prior CPS investigation where no sexual abuse
was found.

31.   This prior CPS investigation occurred after the
date of this offense, but before M.L.'s outcry.

32.   Mr. Barnett and Mr. Emerson believe that this lack
of a sexual abuse finding was important
information to present to the jury.

33.   Mr. Barnett and Mr. Emerson acted reasonably in
allowing information about the prior CPS
investigation.

34.   Facts concerning the stormy relationship between
the applicant and Christine Huffman were admitted
into evidence.

35.   Mr. Barnett and Mr. Emerson believed the fact that
Ms. Huffman continued her relationship with the
applicant despite its storminess affected her
credibility and provided a reason for her to lie
about the alleged abuse of M.L.

36.   Mr. Barnett and Mr. Emerson prevented the
admission of specific allegations of prior
domestic abuse into evidence.

37. Mr. Barnett and Mr. Emerson believed that Ms. Huffman's statements to CPS Investigator Carolyn Kincaid that the applicant was trying to gain custody of M.L. provided an alternate reason for Ms. Huffman's allegations against the applicant.

38. Mr. Barnett and Mr. Emerson acted reasonably in allowing information about the storminess of the applicant's relationship with Ms. Huffman and in eliciting her statements to Ms. Kincaid.

39. Mr. Barnett and Mr. Emerson did not impeach Ms. Huffman's credibility with prior acts of dishonesty and erratic behavior because they did not want to bring character into issue.

40. The applicant had a prior probated felony conviction for sexual assault and prior allegations of domestic violence which Mr. Barnett and Mr. Emerson wanted to keep from the jury during the guilt/innocence portion of his trial.

41. Mr. Barnett and Mr. Emerson were prevented from conducting a wholesale attack on Ms. Huffman's character in order to prevent the admission of more damaging evidence about the applicant's character.

42. Mr. Barnett and Mr. Emerson acted reasonably in limiting their impeachment of Ms. Huffman with extraneous misconduct to avoid opening the door to more significant misconduct by the applicant.

43. Mr. Barnett and Mr. Emerson decided not to have a child psychologist examine M.L. because they did not believe a psychological examination was necessary to present their defensive theory and because they feared a psychological examination might show no coercion by Ms. Huffman.[4]

---

[4]In support of this claim, petitioner, for the first time, presents an affidavit by Dr. Jerome Brown, a clinical

44. Mr. Barnett and Mr. Emerson were concerned that offering psychological testimony would allow the State to rebut with countering psychological testimony.

45. Mr. Barnett and Mr. Emerson believed that their defense theory could best be presented without a battle of the experts.

46. Mr. Barnett and Mr. Emerson acted reasonably in not having M.L. examined by a child psychologist.

47. Mr. Barnett and Mr. Emerson made objections to the prosecution arguments which they thought were not consistent with the evidence presented at trial, and presented a more negative picture of the applicant than supported by the evidence.

48. Barnett and Mr. Emerson did not make other objections because:

   • The prosecution arguments were within the scope of legitimate State argument;
   • Frequent frivolous objections weaken the impact of those objections made by the defense; and
   • Frequent frivolous objections would encourage the State to make similar objections during defense argument.

49. Mr. Barnett and Mr. Emerson acted reasonably in handling closing arguments.

   . . .

_____

psychologist and director of the GRID treatment program for sex offenders and victims, executed on December 15, 2011. (Pet'r Mem., App. 1) There is no indication in the record that this affidavit was presented to the state habeas court and, thus, it cannot be considered by this court in reviewing the claim. *Cullen v. Pinholster*, — U.S. —, 131 S. Ct. 1388, 1398 (2011).

51.  Mr. Barnett and Mr. Emerson made the proper and necessary objections during the applicant's proceedings.

52.  Mr. Barnett and Mr. Emerson made proper strategic decisions regarding the calling of witnesses and the admission of evidence.

53.  Mr. Barnett and Mr. Emerson provided the applicant with adequate representation guaranteed by the Sixth Amendment.

54.  The following evidence undercuts any likelihood that the outcome of this case would have been different with another counsel or if Mr. Barnett and Mr. Emerson had represented the applicant in another manner:

   a.   Christine Huffman met the applicant at work in 1998.

   b.   The applicant moved in with Ms. Huffman and her young son, M.L.

   c.   The relationship between the applicant and Ms. Huffman was plagued with violence toward her and M.L.

   d.   Ms. Huffman and applicant had two children together-a daughter in 1999 and a son in 2002.

   e.   Ms. Huffman and applicant moved around the country splitting up and reuniting several times.

   f.   When M.L. was almost ten years old, he was watching the news with Ms. Huffman and saw a story about a man who was coming forward to tell of sexual abuse he suffered as a child.

   g.   At this time, the applicant and Ms.

Huffman were split up and M.L. had not
seen him for about a year.

h.   M.L. told Ms. Huffman that, when he was
four years old, the applicant had taken
him into the bathroom and put his penis
in M.L.'s mouth.

i.   M.L. reported that the sexual abuse only
happened once.

j.   M.L. waited to tell anyone about it
because he was afraid of the applicant.

k.   During the interview with a social
worker, his medical examination and his
trial testimony, M.L. recounted that
when he was around four years old, the
applicant took him into the bathroom and
put his penis in M.L.'s mouth; and that
he did not tell anyone about the abuse
because he was afraid that the applicant
would kill him.

53.   Given this evidence, there is no reasonable
probability that the jury would have reached a
different result or verdict with counsel other
than Mr. Barnett and Mr. Emerson.

54.   The applicant was not denied effective assistance
of trial counsel.

(State Habeas R. at 169-76) (citations to the record omitted)

Based on its findings and the documentary record, the state

habeas court concluded that counsel made the proper and necessary

objections during the trial proceedings, made proper strategic

decisions regarding the calling of witnesses and the admission of

evidence, and functioned as counsel guaranteed by the Sixth

Amendment under the *Strickland* standard.   The court further
concluded that petitioner had failed to show a reasonable
probability that but for the alleged acts of misconduct by
counsel, the result of his trial would have been different.   (*Id.*
at 167-78, 183) In turn, the Texas Court of Criminal Appeals
denied petitioner's state habeas application without written
order.

Petitioner has presented no argument or evidence in this
federal habeas action that could lead the court to conclude that
the state courts unreasonably applied the standards set forth in
*Strickland* based on the evidence presented in state court.   28
U.S.C. § 2254(d).   Conclusory allegations in support of a claim
of ineffective assistance of counsel are insufficient to meet
*Strickland* standards.   *Green v. Johnson*, 160 F.3d 1029, 1042 (5th
Cir. 1998).   Furthermore, petitioner's complaints largely involve
matters of trial strategy.   Federal habeas courts are not to
lightly second-guess counsel's decisions on matters of tactics
and generally entrust such matters to the professional discretion
of counsel.   Indeed, "[s]trategic choices made after thorough
investigation of law and facts relevant to plausible options are
virtually unchallengeable." *Strickland*, 466 U.S. at 690.   A
conscious and informed decision on trial tactics and strategy

cannot be the basis of constitutionally ineffective assistance of counsel unless it is so ill chosen that it permeates the entire trial with obvious unfairness." *Id.* at 689.

The record contains sufficient evidence to demonstrate that counsel's decisions resulted from an informed trial strategy. Overall, trial counsel devised a viable defense given the horrendous facts of the case, engaged in pretrial investigation, had petitioner examined by a mental health expert, appeared for pretrial hearings, conducted voir dire, gave closing argument, made meritorious objections and motions during trial, cross-examined state witnesses, and called a defense witness. Even if petitioner could demonstrate deficient performance, which he has not, the right to counsel does not require errorless counsel. *Johnson v. Estelle*, 704 F.2d 232, 239 (5th Cir. 1983). A petitioner is required to demonstrate that counsel's performance, in light of the entire proceeding, was so inadequate as to render his trial unfair. *Washington v. Watkins*, 655 F.2d 1346, 1355 (5th Cir. 1981). Having reviewed the entirety of the record, counsel's performance was not outside the wide range of professionally competent assistance, and petitioner has failed to show that but for counsel's acts or omissions, he would have been acquitted of the charges. *United States v. Stewart*, 207 F.3d

30

750, 751 (5th Cir. 2000).  The alleged errors that petitioner recites did not constitute deficient performance and thus could not be the basis of a claim of cumulative prejudice.  *Miller v. Johnson,* 200 F.3d 274, 286 n.6 (5th Cir. 2000).

For the reasons discussed herein,

The court ORDERS the petition of petitioner for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 be, and is hereby, denied.

Pursuant to Rule 22(b) of the Federal Rules of Appellate Procedure, Rule 11(a) of the Rules Governing Section 2254 Cases in the United States District Court, and 28 U.S.C. § 2253(c), for the reasons discussed herein, the court further ORDERS that a certificate of appealability be, and is hereby, denied, as petitioner has not made a substantial showing of the denial of a constitutional right.

SIGNED June ___2 6___, 2012.

JOHN McBRYDE
UNITED STATES DISTRICT JUDGE

31